## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**TAMMY W. RUSSELL,**

        **Plaintiff,**

                                        **Civil Action 2:09-cv-00975**

        **vs.**                               **Magistrate Judge Elizabeth P. Deavers**

**TIMOTHY F. GEITHNER, SECRETARY,**
**UNITED STATE DEPARTMENT OF THE**
**TREASURY,**

        **Defendant.**

## ORDER

This matter is before the Court for consideration of Defendant's April 12, 2012 Motion
for Summary Judgment.  (ECF No. 30.)  Plaintiff filed her Opposition to Defendant's Motion on
June 11, 2012.  (ECF No. 37.)  Defendant filed his Reply on June 25, 2012.  (ECF No. 40.)
Defendant seeks summary judgment on Plaintiff's claims for associational discrimination,
retaliation, and hostile work environment under Section 501 of the Rehabilitation Act.  For the
reasons that follow, Defendant's Motion for Summary Judgment is **GRANTED** as to each of
Plaintiff's three claims.  (ECF No. 30.)

## I. BACKGROUND

Plaintiff Tammy Russell ("Russell") brings claims against her employer, the United
States Treasury ("Treasury"), alleging that her supervisors Paul Meyer and Anita Van Order
discriminated against her on the basis of her association with her autistic son.  Russell further

alleges that Meyer and Van Order retaliated against her for initiating EEO proceedings, and created a hostile work environment because of her association with her autistic son.

Russell began working for Treasury in November, 2000 as a contact representative in Nashville, Tennessee. She remained in Nashville for nearly two years, during which time she experienced various personal hardships, including a divorce, a highly contested custody battle, and her disabled mother's assault. Her son was also diagnosed with autism around the same time. Russell nevertheless consistently received high performance ratings from her supervisors. In August, 2002, Russell transferred to Treasury's Cincinnati office to accept a position as a tax examining assistant. Russell's new position promoted her from the GS-5 to the GS-6 level. The move to Cincinnati also afforded her access to better medical care for her then seven-year-old son. Russell remained in Cincinnati for three years, during which time she was promoted to the GS-7 level and consistently received high performance ratings. In her final two annual evaluations while in Cincinnati, for example, Russell's supervisors rated her performance at 4.2 and 4.8 on a five-point scale.

In March or April, 2005, Russell transferred to Treasury's Columbus office to accept a position as revenue officer. The position required Russell to complete a one-year training program, at which point she would be promoted to the GS-9 level. Her immediate supervisor in Columbus was Paul Meyer. Her second-line supervisor (Meyer's supervisor) was Anita Van Order.

## A.    Russell's First Year in Columbus (April, 2005 through March, 2006)

Russell's first few months in Columbus were uneventful. According to Russell, Meyer first discriminated against her in August, 2005 when he denied her request for leave under the Family Medical and Leave Act ("FMLA"). Russell asked to be excused from a day of training

2

to attend her son's school orientation.  Because 2005 was her son's first year in a new school, she felt it was important to attend the orientation to help introduce him to the new environment.  Although Meyer had previously permitted Russell to miss a training session to attend to her son's needs, on this occasion he denied her request.  (Leave A, Def.'s Mot. Summ. J. Ex. 8, ECF No. 30-8.)  Meyer reminded Russell that trainees were required to attend all training sessions.  He expressed concern that if he were to make an exception for Russell, fairness would require him to make exceptions for others as well.  *Id.*  In light of Meyer's denial, Russell did not attend her son's orientation.

In the following months, Russell requested and was granted time off to attend to various personal issues.  (Leave B, C, D(a)-D(h), *Id.* at Exs. 8-9.)  Russell needed time to care for her son,[1] and also to grieve the loss of her father who passed away after being involved in an accident.  Russell's grandmother also passed during that period.

Despite her personal tribulations, Russell's performance evaluations indicate that she performed well throughout September and October, 2005.  In September, for example, Meyer documented Russell's quality customer service skills, and noted that she adequately explained taxpayer rights to customers.  That same month Meyer rated Russell's performance as fully successful.  In October, Meyer accompanied Russell on a field visit which he later characterized as "productive with good results."  (Pl.'s Op. Ex. 30, ECF No. 37-3 at p. 18.)  In Russell's annual review covering the period of November, 2004 through October, 2005, Meyer rated Russell's performance as fully successful in all critical areas.[2]

---

[1] For example, the record reflects that Russell took time off to care for her son on September 2, 2005; September 5, 2005; and September 22, 2005.  (Leave A-C, Def.'s Mot. Summ. J. Ex. 8, ECF No. 30-8.)

[2] Although the annual review covered the period of November, 2004 through October, 2005, the review itself is dated January, 2006.  (Perf. D., Def.'s Mot. Summ. J. Ex. 15, ECF No.

By December, 2005, however, the record indicates that Russell's need for leave began to affect her work.  During a discussion with Meyer about her need for time off to care for her son, Russell requested permission to work credit hours to compensate for missed time from work. The use of credit hours allows an employee to work extra hours in a given day or week which the employee can then apply to missed time in the future.  Meyer initially indicated that he would approve Russell's use of credit hours so that she could better manage her inventory.  He later retracted his approval, however, and denied Russell's request.  According to Treasury, Meyer retracted his approval because Treasury policy precludes trainees from working credit hours. Russell contends that Meyer retracted his approval out of discriminatory animus and at the direction of Van Order.  (Russell Aff. ¶38, *Id.* at Ex. 1.)

Also in December, 2005, Meyer issued a memorandum to Russell in which he expressed concern over Russell's performance.  (*Id.* at Ex 31, ECF No. 37-3 at p. 19.)  At the time, Russell was on a reduced inventory because she was in training.  Meyer indicated his concern that Russell would be unable to manage the full inventory of a revenue officer, in light of her difficulty with the reduced inventory of a trainee.  He also indicated that Russell needed immediate improvement in the areas of timely action and documentation.  Russell, however, claims that she never received the memorandum.  She believes that Treasury fabricated the memorandum for purposes of this lawsuit.  She points out that she did not sign the December, 2005 memorandum as she had other performance memoranda.  (Russell Aff. ¶ 36.)

Russell's performance evaluations indicate that she was still experiencing performance problems in January, 2006.  That month Meyer noted Russell's failure to take timely action in certain time-sensitive cases.  (Perf. E., Def.'s Mot. Summ. J. Ex 16, ECF No. 30-16.)  Three

30-15.)

4

months later, rather than promote Russell to the GS-9 level as scheduled, Meyer rated Russell's work performance as unacceptable and withheld her promotion. Russell contested Meyer's decision to withhold her promotion. (Perf. H., *Id.* at Ex. 19.) In her written rebuttal, she indicated that her father's death, her grandmother's funeral, and her son's medical condition had caused delays in her cases. She also disputed various office procedures, which she contends further contributed to case delays.

**B.    Russell Initiates EEO Proceedings**

Believing that Meyer withheld her promotion because of her association with her autistic son, Russell submitted a complaint to Treasury's EEO office in April, 2006. The first step in the EEO process required Russell, Meyer and Van Order to meet for an informal conference. Van Order suggested during the meeting that someone with Russell's "issues" might be happier in another job. (Russell Aff. ¶ 47.) Although Van Order would later testify that her comment referred to Russell's personal problems in general, Russell understood Van Order's comment to mean that someone with an autistic child should find another job. *Id.* Also during that meeting Van Order stated that she would hate to see Russell have a nervous breakdown. *Id.* at ¶ 49. Russell interpreted this to mean that Van Order would make her life miserable if she refused to quit. *Id.* Russell, Meyer and Van Order were unable to resolve their differences during the informal conference. Russell filed a formal complaint with the EEOC on August 16, 2006.

**C.    Russell's Second Year in Columbus (May, 2006 through April, 2007)**

Russell's performance evaluations indicate that Russell continued to perform poorly following the April, 2006 informal conference. In May of that year Meyer placed Russell on a 60-day performance improvement plan.

5

Around that same time Meyer required Russell to submit a medical certification to support her requests for FMLA leave.  Russell contends that Meyer denied her subsequent requests for leave pending the certification issue, although she does not point to any specific dates or instances in which this allegedly occurred.  Moreover, she testified in deposition that the only time Meyer denied her request for leave was in August, 2005 when she requested a day off to attend her son's school orientation.  (Russell Dep. 74:15-75:1, Def.'s Mot. Summ. J. Ex. 1, ECF No. 30-1.)  Treasury contends that Meyer routinely granted Russell's requests for leave throughout this period, including during the pendency of the medical certification issue.  (Def.'s Mot. Summ. J. 17, ECF No. 30 (citing Russell Dep. 74:15-75:1, Meyer Dep. at Exs. 2-4).)

Following her placement on the performance plan, Russell's performance began to improve.  Meyer released Russell from the plan in June, 2006, and promoted her to the GS-9 level.  Russell continued to perform well through November, 2006, at which time her performance was rated as "fully successful."  (Perf. L.,fr *Id.* at Ex. 22.)

The record indicates that by January, 2007, Russell's performance again began to decline.  Ms. Stokes, who at the time was acting as the Columbus territory manager, conducted a review of Russell's cases.  Stokes found that Russell performed poorly in three critical areas, and that she had failed to take timely action in fourteen of the fifteen cases observed.  Russell filed two written rebuttals to the case-review indicating that some of the cases included in the review had already been closed and thus should not have been considered.  (Pl.'s Op. Exs. 64-65, ECF No. 37-5 at pp. 5-11.)  She also stated that her difficulties with management in straightening out her requests for FMLA leave, her involvement in EEO proceedings, and her son's medical condition had caused case delay.

In February, 2007, Meyer issued a memorandum to Russell in which he rated her performance as less than fully successful in two critical areas.  He informed her that if her performance did not improve the next step would be to recommend her dismissal.  Russell responded to the memorandum in an e-mail message.  (*Id.* at Ex. 66, ECF No. 37-5 at pp. 12-13.) She expressed concern over office policies that she felt contributed to case delays, as well as the amount of time she spent on the FMLA process.  She also requested permission to work credit hours to maintain her inventory in light of her need for time off to care for her autistic son.

According to Treasury, Russell's performance did not improve.  On May 11, 2007, Van Order recommended Russell's termination.  Russell asserts that the recommendation violated the terms of the union contract ("the National Agreement") because it occurred one year and three days after Russell had been placed on a performance improvement plan.  For this and other reasons, Russell contested the termination proposal.  Her termination was put on hold pending review and final decision from Van Order's supervisor.

**D.**    **Russell's Third Year in Columbus (May, 2007 through February, 2008)**

Russell continued working as a revenue officer while the termination proposal was under consideration.  During this period, Russell claims that she was subject to numerous discriminatory acts by Van Order, as well as Margarete Peters, Meyer's secretary.  Specifically, in August, 2007 Van Order confronted Russell about her attire after someone complained that Russell was dressed unprofessionally.  Treasury had no formal dress code policy at the time.  In September of that year Van Order directed two of Russell's coworkers to search her locked desk and copy her files.  (Russell Aff. ¶ 82.)  In October Van Order directed Russell's supervisor (who had replaced Meyer) to have a discussion with Russell about her recent purchase of a rifle. The record indicates that Russell's coworkers expressed concern for their safety after they

7

overheard Russell tell others that she purchased a rifle so her son could learn to hunt.  (Pl.'s Op. Ex. 6, ECF No. 37-6 at pp. 84-85.)  Russell's supervisor discussed the issue with her and placed a non-disciplinary memo in her file memorializing the conversation.

Russell contends that Meyer's secretary, Margaret Peters, also took discriminatory actions against her.  For example, Peters altered Russell's time cards, which required Russell to spend time correcting the mistakes.  (Russell Aff. ¶ 61.)  On one occasion Peters' mistake caused Russell to lose a day's worth of pay, which in turn caused her to incur an insufficient funds fee from her bank.  Treasury reimbursed Russell for the loss in pay but not for the insufficient funds fee.  Peters also accessed Russell's confidential taxpayer information, which constitutes a significant privacy breach and violates federal regulations.  (Russell Aff. ¶¶ 100, 101.)

Finally, Russell claims that she was denied a promotion to a GS-11 position because of Van Order's termination proposal.  In December, 2007, Russell was the only applicant to apply to an open GS-11 position.  Treasury rejected her application, purportedly because an insufficient number of candidates had applied.  (Pl.'s Op. Ex. 75, ECF No. 37-6, at p. 90.)  According to Russell, however, single-applicant candidates had received promotions in the past.  She believes she was denied the position because of the pending termination proposal.

**E.      Treasury Declines to Terminate Russell**

As part of the investigation into Van Order's termination proposal, Russell delivered an oral rebuttal in October, 2007.  In her rebuttal Russell indicated that her performance problems were caused by Meyer's failure to provide adequate training and the time required for her to institute EEO proceedings and straighten out her requests for FMLA leave.  (Pl.'s Op. Ex. 6, ECF No. 37-6 at pp. 15-18; 58, 60-61.)

In February, 2008, the Columbus territory manager rejected Van Order's termination proposal.  (*Id.* at Ex. 76, ECF No. 37-6 at p. 91.)  She notified Russell that her performance deficiencies warranted her removal, but that she had decided not to take action at that time.  She further indicated that Van Order's reasons for the proposal were subject to mitigating factors which may or may not have been appropriately factored into Van Order's decision.  *Id.*

Both Meyer and Van Order retired by early 2008.  Russell continued to work in Columbus as a revenue officer.  In July, 2009 she was promoted to the GS-11 level, where she remains today.  Since Meyer and Van Order retired, Russell has been asked to teach classes at various seminars throughout Ohio and elsewhere, including at a national training program in Dallas, Texas.

**F.      Meyer's and Van Order's TIGTA Affidavits**

As a result of Peters' unauthorized access to Russell's confidential taxpayer information, the Treasury Inspector General for Tax Administration ("TIGTA") initiated an investigation and disciplinary proceedings against Peters.  In 2009, Meyer and Van Order submitted affidavits on Peters' behalf describing the work environment at Treasury at the time of her misconduct.

Both Meyer and Van Order mentioned Russell in their affidavits, and described how her EEO action and FMLA requests affected the work environment.  (Pl.'s Op. App. III, Exs. B and C, ECF No. 37-8.)  Meyer indicated that Russell filed or threatened to file EEO actions and personal lawsuits against Treasury management and staff.  According to Meyer, this created a negative work environment.  Van Order stated that Russell became obsessive and paranoid over the FMLA process, and extremely vocal about her EEO actions.  She also indicated that EEO officers had spent considerable time interviewing employees with reference to Russell's and two

other employees' EEO complaints, which contributed to a negative and tense working environment.

Russell contends that the affidavits demonstrate not only Meyer's and Van Order's discriminatory animus and retaliatory motive toward Russell, but also that Meyer and Van Order worked in concert with Peters when she took discriminatory actions against Russell.

## II.  SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(c), the Court should render summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The movant "bears the burden of proving the absence of genuine issues of material fact and its entitlement to judgment as a matter of law." *Longaberger Co. v. Kolt*, 586 F.3d 459, 465 (6th Cir. 2009) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  In determining whether a moving party has met its burden, "[t]he evidence must be viewed in a light most favorable to the party opposing the motion, giving that party the benefit of all reasonable inferences." *Smith Wholesale Co., Inc. v. R.J. Reynolds Tobacco Co.*, 477 F.3d 854, 861 (6th Cir. 2007).   If the movant satisfies this burden, "the nonmoving party 'must present significant probative evidence' to demonstrate that 'there is [more than] some metaphysical doubt as to the material facts.'" *Longaberger*, 586 F.3d at 465 (quoting *Moore v. Philip Morris Cos., Inc*., 8 F.3d 335, 340 (6th Cir.1993)).  In responding to a summary judgment motion, the nonmoving party "may not rest upon its mere allegations or denials of the adverse party's pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Steward v. New Chrysler*, No. 08-1282, 2011 WL 338457, at *7 (6th Cir. Feb. 4, 2011) ("At this stage in the

ligitation, a plaintiff may no longer rely solely on her pleadings, but must come forward with 'probative evidence tending to support the Complaint.'") (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986)). The Court must grant summary judgment if the opposing party fails to make as showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex*, 411 U.S. at 322. When reviewing a motion for summary judgment, the Court "need not consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). It is not the obligation of the Court, however, to comb the record to find evidence or testimony establishing a party's case. *Nerswick v. CSX Transp., Inc.*, 692 F. Supp. 2d 866, 882 (S.D. Ohio 2010) (citing *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989)).

## III. ANALYSIS

The Rehabilitation Act is the exclusive remedy for government employees bringing employment discrimination claims based on a disability. *See* 42 U.S.C. § 12111(5)(B) (defining employers under the Americans with Disabilities Act ("ADA") and excluding the United States or a corporation wholly owned by the United States government as a covered employer); *Peltier v. United States*, 388 F.3d 984, 989 (6th Cir. 2004) ("[T]he Rehabilitation Act . . . provides the remedy for federal employees alleging disability discrimination."); *Felder v. Runyon*, No. 00-cv-1011, 2000 WL 1478145, at *1 (6th Cir. Sept. 26, 2000) ("[T]he [Rehabilitation] Act is the exclusive means for a federal employee to bring a claim of disability discrimination in federal court."). Moreover, the law imputes no significant difference between the substantive standards of the ADA and the Rehabilitation Act as they relate to disability discrimination. The Rehabilitation Act expressly provides as follows:

11

> The standards used to determine whether this section has been violated in a complaint alleging nonaffirmative action employment discrimination under this section shall be the standards applied under title I of the Americans with Disabilities Act of 1990 (42 U.S.C. § 12111 *et seq*.) and the provisions of sections 501 through 504, and 510, of the Americans with Disabilities Act of 1990 (42 U.S.C. §§ 12201-12204 and 12210), as such sections relate to employment.

29 U.S.C. § 791(g) (2009); *see also Calero-Cerezo v. United States Dept. Of Justice*, 355 F.3d 6, 11 n.1 (1st Cir. 2004) ("The same standards . . . apply to claims under the ADA and under the Rehabilitation Act."). Accordingly, the Court applies as necessary the same principles that govern ADA claims to all three of Russell's claims in this case.

Russell contends that Treasury (1) discriminated against her on the basis of her association with her disabled son; (2) retaliated against her for engaging in protected activity; and (3) created a hostile work environment because of her association with her disabled son. The Court addresses each claim in turn.

**A.     Discrimination on the Basis of Russell's Association With her Disabled Son**

Russell alleges that Treasury discriminated against her on the basis of her association with her disabled son. As the Sixth Circuit recently observed, claims for associational discrimination arise under an "infrequently litigated" section of the ADA that has scarcely been addressed in published opinions.[3] *Stansberry v. Air Wisc. Airlines Corp.*, 651 F.3d 482, 486 (6th Cir. 2011). Section 12112(b)(4) of the Act prohibits employers from "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association." 42 U.S.C. § 12112(b)(4). Thus, associational discrimination occurs when an employer

---

[3] The Court has found no precedent related to associational discrimination under the Rehabilitation Act and thus relies on the cases arising under the ADA, however few.

12

discriminates against its employee, not because the employee is disabled, but because the employee shares a close relationship with a disabled person. *Stansberry*, 651 F.3d at 486.

The Sixth Circuit has recognized three theories of associational discrimination: (1) "expense"; (2) "disability by association"; and (3) "distraction." *Id.* at 487 (adopting the framework set forth in *Larimer v. Int'l Bus. Machs. Corp.*, 370 F.3d 698, 700 (7th Cir. 2004)). Under the "expense" theory, the employer discriminates against the employee because her association with a disabled person covered under the employer's health plan is costly to the employer. *Id.* The "disability by association" theory refers to two related situations. Either the employer fears that the employee might contract the disability of the person with whom she is associated (for example, if the employee's partner suffers from HIV, the employer might fear that the employee could become infected), or the employee carries the risk of developing the same disability as her relative because of a genetic predisposition. *Id.* Finally, the "distraction" theory relates to an employer's fear that the employee's association with the disabled person will cause the employee to become inattentive at work. *Id.* (citing *Larimer*, 370 F.3d at 700).

Here, Russell does not expressly indicate which of the three theories applies to her case. She offers no evidence that her son's disability exposes Treasury to excessive healthcare costs. Nor does she (or science) suggest that Treasury fears she might develop autism. Thus, Russell's claim could only arise under the distraction theory of associational discrimination.

## 1.     Russell's Prima Facie Case of Associational Discrimination

Because Russell offers no direct evidence of associational discrimination, she must proceed under the now familiar *McDonnell-Douglas* burden-shifting framework. *Stansberry*, 651 F.3d at 487 (referring to the framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). To establish a prima facie case of associational discrimination under the

13

distraction theory, Russell must demonstrate that (1) she was qualified for the relevant position; (2) she suffered an adverse employment action; (3) she was known to be associated with a disabled person; and (4) Treasury took the adverse employment action under circumstances that raise a reasonable inference that a determining factor for its decision was Russell's association with the disabled person. *Id.* at 486.  Once Russell establishes a prima facie case, the burden shifts to Treasury to offer a legitimate nondiscriminatory reason for the adverse action.  *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 585 (6th Cir. 2009).  The burden then shifts back to Russell to establish that Treasury's stated reason is pretextual.  *Id.* at 586.

The parties do not dispute that Russell was known to be associated with a disabled person, which is the third element of her prima facie case.  The Court therefore addresses each of the three remaining elements below.

### a.     Russell was Qualified for the Position

The first element of a prima facie case of associational discrimination requires Russell to prove that she was qualified for the relevant position or promotion.  To do that, Russell must demonstrate that she was meeting her employer's legitimate expectations and performing to her employer's satisfaction.  *Warfield v. Lebanon Corr. Inst.*, 181 F.3d 723, 729 (6th Cir. 1999) (citing *Ang v. Procter & Gamble Co.*, 932 F.2d 540, 548 (6th Cir. 1991)).  At this stage, only Russell's "objective" qualifications matter.  *See Upshaw*, 576 F.3d at 585 (citing *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 575-76 (6th Cir. 2003) (en banc) (holding that the assessment of qualifications at the prima facie stage includes only "objective" qualifications)); *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1298 (D.C. Cir. 1998) (en banc) (noting that "an employer's asserted strong reliance on subjective feelings about the candidates may mask discrimination").  Russell must present credible evidence that her qualifications "are at least

14

equivalent to the minimum objective criteria required" for the position or promotion.  *Wexler*, 317 F.3d at 576.

Russell claims that Treasury took adverse employment actions against her in March, 2006 when Meyer refused to promote her, and again in May, 2007 when Van Order recommended her termination.  Russell must demonstrate that she was qualified for the position when each action was taken.

In support of her argument that she was qualified for the promotion in March, 2006, Russell points to her initial performance review after she transferred to Columbus, in which Meyer rated her performance as "fully successful."  (Pl.'s Op. 26, ECF No. 37.)  Russell also relies on her long history with Treasury and the fact that she had consistently received high performance ratings before she transferred to Columbus.  In her annual review just prior to her transfer Russell received a performance rating of 4.8 on a five-point scale.  Finally, Russell argues that Meyer's negative performance evaluations are irrelevant because they reflect his subjective feelings toward her.  At this stage, as Russell points out, the Court considers only objective evidence.

Treasury contends that Russell was not qualified for the promotion, arguing that her "performance reviews consistently reflected her inability to keep up with her workload, even when her inventory was reduced."  (Def.'s Reply 3, ECF No. 40.)  Treasury dismisses Russell's previous experience with the IRS as requiring "a completely different level of expertise and responsibility than a revenue officer position."  *Id.* at 4.  Treasury argues that Russell cannot possibly demonstrate that she was performing to her employer's satisfaction at the GS-9 level, because as of March, 2006 "she had never worked in such a technical capacity before."  *Id.* at 6.  Finally, Treasury minimizes the fact that Meyer rated Russell's performance through October,

15

2005 as "fully successful." It contends that any performance issues that developed after October would not have been reflected in the January, 2006 evaluation.

Russell has produced sufficient evidence to establish a genuine issue of material fact as to whether she was qualified for the GS-9 promotion in March, 2006. First, Meyer eventually promoted Russell to the GS-9 position in June of that year. Not only did Russell perform successfully in that position once promoted, she received a subsequent promotion. Also, the fact that Russell performed fully successfully through the previous October, and indeed throughout the entirety of her career with Treasury up to that point, could lead a reasonable jury to conclude that she was qualified for the promotion in March. Finally, the Court is unpersuaded by Treasury's argument that Russell cannot show she was qualified for the promotion because at that point she had never held such a technical position. Under this logic, no employee could ever recover for her employer's failure to promote. Moreover, Meyer hired Russell into the revenue officer training program, which suggests he or other Treasury managers determined that Russell possessed the capabilities to succeed.

A genuine issue of material fact also exists as to whether Russel was qualified for the GS-9 position when Van Order recommended her termination in May, 2007. Neither party directly argues this point.[4] The Court notes, however, that Van Order's supervisor ultimately rejected the termination proposal, which creates an issue of material fact as to Russell's qualifications. Moreover, Russell's subsequent success at the GS-9 level and her later promotion to GS-11 could lead a reasonable jury to conclude that she was qualified.

---

[4] Treasury takes the position that the May, 2007 termination proposal does not constitute an adverse action, which is likely why it chose not to argue that Russell was unqualified at that time.

Accordingly, Russell has established the first element of a prima facie case of associational discrimination as to both the March, 2006 refusal to promote and the May, 2007 termination proposal.

**b.      Russell Suffered Adverse Employment Action**

The next element of a prima facie case of associational discrimination requires Russell to prove that she suffered an adverse employment action.  An adverse employment action is a "'materially adverse change in the terms or conditions of . . . employment because of [the] employer's conduct.'"  *Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 182 (6th Cir. 2004) (quoting *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 886 (6th Cir. 1996).  To be "materially adverse," a change in employment conditions "must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id*.  "'The Sixth Circuit has consistently held that de minimis employment actions are not materially adverse and, thus, not actionable.'"  *Id.* (quoting *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 462 (6th Cir. 2000)).  "'Examples of adverse employment actions include firing, failure to promote, reassignment with significantly lower responsibilities, a material loss of benefits, suspensions, and other indices unique to a particular situation.'" *EEOC v. SunDance Rehab. Corp.*, 466 F.3d 490, 501-02 (6th Cir. 2006) (quoting *Smith v. City of Salem*, 378 F.3d 566, 575-76 (6th Cir. 2004)).

Russell contends that she suffered four separate adverse employment actions: (1) in August, 2005 Meyer denied Russell's request for time off to attend her son's school orientation; (2) in January, 2006 Meyer denied Russell's request to work credit hours; (3) in March, 2006 Meyer refused to promote Russell to a GS-9 position; and (4) in May, 2007 Van Order recommended Russell's termination.

Meyer's refusal to allow Russell to take time off to attend her son's school orientation does not rise to the level of an adverse employment action.  Russell's entire argument in this regard is that "[b]ecause Russell was entitled to FMLA, the denial of the leave was an adverse action."  (Pl.'s Op. 26, ECF No. 37.)  The Court disagrees.  First, Russell offers no support for her position that she was entitled to FMLA leave to attend the orientation.  More importantly, Russell's inability to attend one of her son's school functions while she was in training does nothing to alter the terms and conditions of her employment.  *Cf Regan v. Faurecia Automotive Seatings, Inc.*, 679 F.3d 475, 481 (6th Cir. 2012) (holding that an employer's denial of a request to have a modified work schedule is not a "significant change in employment status").  The Sixth Circuit has consistently held that "mere inconvenience . . . is not enough to constitute an adverse employment action."  *White v. Burlington N. & Santa Fe Ry. Co.*, 364 F.3d 789, 797 (6th Cir. 2004) (en banc) (internal quotation marks omitted).  Moreover, even though Russell's request for time off related to her son's disability, "employers are not required to provide reasonable accommodation to non-disabled workers under [the ADA]."  *Stansberry*, 651 F.3d at 486 (citing *Larimer*, 370 F.3d at 700).

Nor does Meyer's refusal to allow Russell to work credit hours constitute an adverse employment action.  Russell asserts that "[i]n January 2006 Russell was refused permission to work credit hours. . . [and that t]his too is an adverse action."  (Pl.'s Op. 26, ECF No. 37.)  Russell provides no further argument or support for her position.  In any event, the Sixth Circuit has observed that a "refusal to grant . . . discretionary schedule adjustments" does not amount to an adverse employment action.  *Blake v. Potter*, 247 Fed. App'x 673, 675 (6th Cir. 2007); *see also Wills v. Pennyrile Rural Elec. Co-op. Corp*, 259 Fed. App'x 780, 784 (6th Cir. 2008)

(holding that an employer's refusal to permit employee to leave work ten minutes early one day each month is not an adverse employment action).

The parties agree and the Court confirms that Meyer's March, 2006 refusal to promote Russell to the GS-9 level constitutes an adverse employment action.  *See SunDance*, 466 F.3d at 501-02 (specifically listing failure to promote as an example of an adverse employment action).

Finally, genuine issues of material fact remain as to whether Van Order's termination proposal rises to the level of an adverse employment action.  This question is a close one, to be sure.  While Treasury considered the termination proposal, Russell was the only candidate to apply for an available position at the GS-11 level.  Treasury rejected Russell's application, allegedly due to an "insufficient pool of applicants."  (Pl.'s Op. Ex. 75, ECF No. 37-6, at p. 90.)  Russell avers, however, that Treasury had promoted single-applicant employees in the past.  (Russell Aff. ¶ 96, ECF No. 37-1.)  Thus, she contends that its refusal to promote her must have been based on Van Order's termination proposal.  A reasonable jury could arrive at such a conclusion.  The Court acknowledges Treasury's argument that Van Order merely threatened to terminate Russell and that threats cannot qualify as adverse employment actions.  *See Plautz v. Potter*, 156 Fed. App'x 812, 817 (6th Cir. 2005) ("[I]t is well settled in this circuit that a threat to discharge is not an adverse employment action.") (citation omitted).  Considering the evidence in the light most favorable to Russell, however, the Court finds that a genuine issue of material fact exists as to whether Van Order's proposal materially affected the terms and conditions of Russell's employment.

Accordingly, Russell has established the second element of her prima facie case with regard to Meyer's refusal to promote and Van Order's termination proposal.

      **c.**    **Russell's Association With her Disabled Son was a Determining Factor in the Adverse Actions**

The final element of a prima facie case of associational discrimination requires Russell to prove causation.  Specifically, Russell must demonstrate that Treasury's adverse employment actions occurred under circumstances that give rise to a reasonable inference that her son's disability was a determining factor in Treasury's decisions.  *Stansberry*, 651 F.3d at 487.

Russell points to various instances which she contends establish causation.  First, Meyer's March, 2006 refusal to promote Russell closely followed a December, 2005 discussion the two had about Russell needing time off to care for her son.[5]  Also, a month after Meyer's decision Van Order suggested that Russell find another job that might better accommodate her "issues."  (Pl.'s Op. 28, ECF No. 37.)  Van Order also allegedly insinuated that she would cause Russell to have a nervous breakdown if she refused to move on.  Russell relies on the same evidence to establish causation with respect to Van Order's 2007 termination proposal.  Russell further asserts that Van Order's termination proposal closely followed Meyer's request that Russell provide medical certifications to support her FMLA requests.[6]

Treasury argues that Russell's documented performance deficiencies preclude her from demonstrating causation.  Also, Meyer and Van Order knew of Russell's association with her disabled son as early as March, 2005, a full year before the first adverse action occurred.  This, according to Treasury, undercuts Russell's attempt to demonstrate causation.

---

[5] Although Russell does not set forth the substance of that conversation, presumably she refers to the discussion in which "Meyer and Russell discussed that Russell was missing time from work because of her son."  (Pl.'s Op. 11, ECF No. 37.)

[6] It is not clear when Meyer purportedly requested the medical certification, although Russell alleges in her fact statement that "[t]he IRS first raised the issue of medical certification on May 12, 2006."  (Pl.'s Op. 8, ECF No. 37.)

Resolving all reasonable inferences in Russell's favor, the Court finds that Defendant has failed to demonstrate that no genuine issue of material fact exists as to Plaintiff's theory of causation. Van Order's comments concerning Russell's "issues" and her alleged threat to force Russell into a nervous breakdown could lead a reasonable jury to find that Van Order harbored discriminatory animus toward Russell. Finally, the Court notes the circumstances surrounding Meyer's December, 2005 performance evaluation. Russell was quite vocal in acknowledging and rebutting all of her negative performance evaluations. Curiously, however, she did not acknowledge or otherwise respond to the December, 2005 evaluation. These issues, however, relate to questions of credibility and context, which are to be decided by the jury under almost all circumstances.

Russell has, therefore, established a prima facie case of associational discrimination under the Rehabilitation Act.

**2.      Treasury's Legitimate Nondiscriminatory Reason**

The burden now rests with Treasury to "articulate some legitimate, nondiscriminatory reason" for taking the adverse actions. *Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir. 2003) (quoting *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 573 (6th Cir. 2000)). Its burden is merely one of production, not persuasion, and it does not involve credibility assessments. *Upshaw*, 576 F.3d at 585 (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000)). Treasury's "burden is satisfied if [it] simply explains what [it] has done or produces evidence of legitimate nondiscriminatory reason." *Bd. of Trustees of Keene State Coll. v. Sweeney*, 439 U.S. 24, 25 n.2 (1978) (internal quotation marks omitted).

Once Treasury meets its burden, Russell must "prove that the proffered reason was actually a pretext to hide unlawful discrimination." *Kroger*, 319 F.3d at 866 (quoting *Univ. Of*

*Cincinnati*, 215 F.3d at 573). The ultimate burden of proof remains on the Plaintiff at all times. *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (2000) (citing *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 (1993)).

Treasury contends that Meyer refused to promote Russell because of Russell's "continuously poor performance as evidenced by low evaluations of her work." (Def.'s Reply 12, ECF No. 40.) Treasury did not expressly provide a legitimate nondiscriminatory reason for Van Order's termination proposal.[7] The proposal itself, however, indicates that Van Order relied on Russell's poor performance as well. (Def.'s Mot. Summ. J. Ex. 26, ECF No. 30-26.) Treasury has therefore adduced sufficient evidence, namely poor work performance, which satisfies its burden to offer a legitimate nondiscriminatory reason for its action. *See Romans v. Mich. Dept. of Human Services*, 668 F.3d 826, 839 (6th Cir. 2012) (a defendant's burden is met if it "produces evidence of legitimate nondiscriminatory reasons") (quoting *Texas Dep't of Comty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)).

**3.      Russell Cannot Demonstrate That Treasury's Stated Reason is Pretextual**

Russell bears the burden to demonstrate that Treasury's stated reason is actually pretext to hide unlawful discrimination. She can do so by showing that its stated reason (1) has no basis in fact; (2) did not actually motivate the challenged conduct; or (3) is insufficient to explain the adverse actions. *Kroger*, 319 F.3d at 866 (citing *Dews*, 231 F.3d at 1021). Ultimately, Plaintiff must produce "sufficient evidence from which the jury could reasonably reject [Treasury's] explanation and infer that [Treasury] intentionally discriminated against [her]." *Id.* (citing *Braithwaite v. Timeken Co.*, 258 F.3d 488, 493 (6th Cir. 2001)).

---

[7] Again, this is likely because Treasury took the position that Van Order's proposal is not an adverse employment action.

Russell does not indicate which of the three methods of establishing pretext applies to her claim. She cannot establish that Treasury's stated reason is insufficient to explain the adverse action, however, because to do so requires "evidence that other employees, particularly employees not in the protected class, were not [treated adversely] even though they engaged in substantially identical conduct to that which the employer contends motivated its [adverse action against] the plaintiff." *Kroger*, 319 F.3d at 866 (citing *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994) (overruled on other grounds)). Russell has not offered evidence that Treasury treated other similarly situated employees differently than her. Thus, to establish pretext, Russell must either show that (1) Treasury's stated reason has no basis in fact, or (2) Treasury's stated reason did not actually motivate the adverse actions.

### a. Russell Cannot Demonstrate That Treasury's Stated Reason has no Basis in Fact

Russell argues that Treasury's stated reason for its adverse actions has no basis in fact. She alleges that she performed well throughout her career with Treasury, including during the periods surrounding Treasury's adverse actions. The negative performance reviews upon which Treasury relies, according to Russell, are themselves the product of Meyer's discriminatory intent and do not reflect Russell's true performance. None of the negative information contained in the reviews is substantiated, Russell argues, and, in any event, she "rebutted [the reviews] effectively." (Pl.'s Op. 30, ECF No. 37.) Moreover, Russell contends that the inconsistences in the performance reviews further undermine the credibility of their contents:

> [T]here is no reasonable explanation for why Meyer found Russell's work successful in September and October of 2005, inadequate in December 2005 (in a document that Russell contends was fabricated), fully successful in her Annual Rating of Record in January 2006, then found her performance to be deficient again in March 2006.

*Id.* Furthermore, Russell's previous supervisors consistently reported that she performed well prior to her transfer to the Columbus office. This is true, Russell points out, even during periods when her personal life was in flux, including during the time surrounding her divorce and highly-contested custody battle, her disabled mother's assault, and her son's diagnosis with autism. Finally, Russell argues that Meyer's refusal-to-promote and Van Order's termination proposal violated the terms of the National Agreement, which further suggests that the actions constitute pretext.

The Court disagrees. All the evidence, including Russell's rebuttals to her performance evaluations, indicates that Russell performed poorly during the periods surrounding Treasury's adverse employment actions. Multiple performance reviews surrounding the March, 2006 refusal to promote, for example, demonstrate Russell's substandard performance. On January 25, 2006 Meyer issued a memorandum to Russell reminding her that it is unacceptable to wait 47 days to handle certain issues in time-sensitive cases. (Perf. E., Def.'s Mot. Summ. J. Ex. 16, ECF No. 30-16.) He noted in the memorandum that Russell had allowed the expiration date on two of her time-sensitive cases to nearly lapse. On March 3, 2006, Meyer conducted a review of Russell's performance, in which he noted "gaps in contacts, late initial contacts, late follow-up actions, and extended deadlines" relating to Russell's work. (Perf. G., *Id.* at Ex. 18, ECF No. 30-18.) At that time Russell was on a reduced scheduled of 55 cases, rather than the usual 75-case load, because she was in training status. Had Russell been promoted following that review, she would have become responsible for the regular load of 75 cases. On May 8, 2006, Meyer conducted another case review and noted problems with ten of Russell's cases. One case "lacked logical case development due to gaps in case actions." (Perf. I, *Id.* at Ex. 20, ECF No. 30-20.) In another, Russell "failed to correctly analyze financial information in the case and

failed to take appropriate enforcement action." *Id.*  Another "indicate[d] a lack of initial

analysis, review of financial information, and a lack of enforcement activity.  *Id.*  In another,

Meyer noted that Russell "failed to secure collection financial information and . . . failed to take

timely enforcement action.  *Id.*

      The evidence likewise demonstrates that Russell performed below work standards with

respect to Van Order's May, 2007 termination proposal.  *See* Pl.'s Op. Ex. 66, ECF No. 37-5 at

pp. 6-11 (Meyer informing Russell in February, 2007 that if her performance did not improve the

next step would be dismissal); Def.'s Mot. Summ. J. Ex. 26, ECF No. 30-26 (Van Order's

termination proposal setting forth Russell's performance deficiencies in detail).  Furthermore, a

total of three different supervisors conducted independent reviews of Russell's work, and all

noted during that time that Russell performed poorly.  The three supervisors in question include

Meyer, Van Order, and Stokes.

      Russell contends that, "in light of Russell's rebuttal[s], whether Russell's performance

was, in fact, deficient, presents a question for the jury."  (Pl.'s Op. 30, ECF No. 37.)  In her

rebuttals, however, Russell repeatedly acknowledges that she had, indeed, performed poorly.  In

response to the March 3, 2006 performance evaluation, Russell admits as much:

> [A] family crisis and not being allowed to work credit hours as requested to
> compensate for the time lost because of time needed to take care of the personal
> issue of my father's accident/death, my grandmother's death/funeral and my son's
> condition . . . [have] caused delays in timely follow ups, along with training issues
> and the timing of training and personal issues combined.

(Perf. H., Def.'s Mot. Summ. J. Ex. 19, ECF No. 30-19.)  Russell acknowledged in January,

2007 that familial and other factors had caused "a negative effect on managing [her] inventory."

(Perf. M-O, *Id.* at Ex. 23, ECF No. 30-23.)  In response to the January, 2007 case-review,

Russell again acknowledged delays in case action, but attributed the delays to "issues with

management in regards to FML request[s]." *Id.* She later attributed case-action delays to time spent correcting her time cards. (Pl.'s Op. Ex. 65, ECF No. 37-5 at pp. 6-11.) Russell has also stated: "my child's condition was causing delays in the time spent on time issues," and "the time missed to care for my child makes it difficult to meet deadlines." *Id.* at Ex. 66, ECF No. 37-5 at pp. 12-13. At one point, Russell informed Meyer that "[c]redit hours will be needed to maintain my inventory since I have a special needs child and due to his condition will need time to care for his needs." *Id.* Indeed, in her oral rebuttal to Van Order's 2007 termination proposal, Russell's entire argument centered on inadequate training and problems with management that allegedly caused Russell to experience performance problems. *Id.* at Ex. 68, ECF No. 37-6 at p. 1. At no point in her oral rebuttal or otherwise did Russell refute her supervisor's claims that she performed poorly. Rather, she repeatedly acknowledged her performance problems, but attributed them to external forces. Russell's failure to perform to her employer's satisfaction is fatal to her claim. *Stansberry*, 651 F.3d at 488.

Moreover, Russell's most significant performance problem was delay in case action. Yet Russell continuously spent considerable time writing lengthy, time-consuming e-mails to her supervisors, even after her supervisors asked her to refrain from doing so. In February, 2007, for example, Russell wrote to Meyer: "As you are aware, I spent 3 hours [writing e-mails] on 02/23/2007 and [a lot] of time was exhausted continually writing e-mails to [supervisors] . . . which has exhausted time from my cases and caused harm to my performance in meeting timely follow-ups." (Pl.'s Op. Ex. 66, ECF No. 37-5 at 28.) Meyer had asked Russell not to spend time writing lengthy e-mails: "[W]e need to discuss these items in our bi-weekly meetings and not via long time consuming e-mails . . . . [T]his takes [a] considerable amount of time away from you working on cases." *Id.*, ECF No. 37-5 at p. 41. At another time he wrote: "Again, I want to

26

emphasize that these long e-mails are very time consuming . . . . I indicated earlier that a face to face meeting is more beneficial." *Id.* at Ex 56, ECF No. 37-4 at p. 44. Van Order expressed the same sentiment: "As we discussed [e-mail] is not the preferred method of communication . . . [t]oo lengthy and time consuming." *Id.* at Ex. 66, ECF No. 37-5 at p. 39. Plaintiff nevertheless continued to send e-mails that in some instances exceeded three pages in length. *Id.* at Ex. 73, ECF No. 37-6 at pp. 86-88.[8]

Finally, the Court finds Russell's remaining pretext arguments unpersuasive. Russell's inconsistent performance reviews do not provide evidence of pretext and, if anything, undermine her claim. The Court cannot impute a discriminatory motive to Meyer when he actually provided favorable performance reviews. Moreover, Russell's repeated acknowledgments that she performed poorly overcomes any suspicion related to the inconsistencies in performance evaluations. Finally, even if Meyer and Van Order violated the National Agreement when they took the adverse actions, this oversight simply does not create an inference of pretext, especially, again, because Russell admitted that she had performed poorly.

Thus, Plaintiff has failed to adduce sufficient evidence to demonstrate the existence of a genuine issue of material fact that Treasury's stated reason has no basis in fact.

---

[8] The Court notes that Russell attributes much of her work-performance problems and delays to the time she spent caring for her disabled child. For instance, in her declaration in support of her EEO Complaint, Russell states that Meyer was unhappy with the "fact that I need time off to take care of my disabled son and Mr. Meyer doesn't want to deal with that. (Def's Mot. Summ. J. Ex. 27, ECF No. 30-27.) Again, unlike the actual disabled person, an employer is not required to reasonably accommodate an employee based on her affiliation with a disabled person. *Overley v. Covenant Transp., Inc.*, 178 Fed. App'x 488, 493 (6th Cir. 2006). In other words, Russell cannot claim that Treasury discriminated against her by not granting her sufficient time off or other accommodations so that she could care for her son.

**b.** **Russell Cannot Demonstrate That Treasury's Stated Reason did not Actually Motivate the Adverse Actions**

Russell could still establish pretext if she demonstrates that Treasury's stated reason did not actually motivate the adverse actions. *Kroger*, 319 F.3d at 866. Under this approach, a plaintiff "admits the factual basis underlying the employer's proffered explanation and further admits that the conduct could motivate dismissal," but "attempts to indict the credibility of [the] employer's explanation by showing circumstances which tend to prove that an illegal motivation was *more likely* than that offered by the defendant." *Id.* (emphasis in original) (citing *Manzer*, 29 F.3d at 1084).

As discussed earlier, although Russell argues in her brief that she experienced no significant problems functioning at her job, she repeatedly admitted and acknowledged her performance deficiencies throughout the record. In light of her admissions, and for the sake of completeness, the Court considers whether Russell could demonstrate that Treasury's stated reason, though true, did not actually motivate the adverse action. She cannot.

Russell has not offered sufficient evidence to establish a genuine issue of material fact as to whether her association with her disabled son was more likely than her performance deficiencies to have motivated Treasury's adverse actions. Again, under the distraction theory of associational discrimination, the question is whether Meyer and Van Order acted out of unfounded fears that Russell's association with her son would cause her to become distracted at work. *Stansberry*, 651 F.3d at 486. But Russell, in her rebuttals, concedes that *she was* distracted at work, or at least that she was performing poorly for reasons that she attributes to being distracted because of her son. Thus, she cannot demonstrate that an unfounded fear of distraction was the more likely cause for the adverse actions.

28

Furthermore, insufficient evidence exists that would suggest Meyer or Van Order harbored discriminatory animus toward Russell because of her association with her son.  Most of the evidence she contends establishes discrimination is common and ordinary to the workplace.  This includes Meyer's denial of her request for leave to attend her son's school orientation, as well as his denial of her request to work credit hours while she was in training.  The same is true with regard to Meyer's request for medical certification.  Although Van Order's comments about Russell's "issues" and the possibility that she may have a nervous breakdown may connote discriminatory animus, two isolated comments in a three-year span cannot overcome Russell's documented performance problems.

Additionally, significant affirmative evidence exists to suggest neither Van Order nor Meyer held discriminatory feelings toward Russell.  Meyer knew of Russell's son's disability when he interviewed her, yet offered her the job.  (Def.'s Mot. Summ. J. Ex 27, ECF No. 30-27.)  The first alleged adverse action did not occur until nearly a year after Russell started in Columbus, which undercuts an inference of discriminatory intent.  *See Stansberry*, 651 F.3d at 488 (noting that an employer's long-standing knowledge of the plaintiff's association with a disabled person undercuts an inference of discrimination).  Similarly, Van Order knew of Russell's association with her disabled son shortly after Russell began working in Columbus.  (Def.'s Mot. Summ. J. Ex. 27, ECF No. 30-27.)  It was another two years before Van Order purportedly took adverse action against her.  Furthermore, even Russell acknowledges in her deposition that Meyer accommodated all but one of her requests for leave.  (Russell Dep. 74:15-75:1, *Id.* at Ex. 1, ECF No. 30-1.)  He also routinely approved her requests to work credit hours once she left trainee-status.  (*Id.* at Exs. 10-12, ECF No. 30-10-12.)

29

Accordingly, no genuine issue of material fact remains as to whether Treasury's stated reason did not actually motivate its adverse action. Although Russell established a prima facie case of associational discrimination, she cannot demonstrate that Treasury's legitimate nondiscriminatory reason is pretextual. Her claim for associational discrimination thus fails. Summary judgment for Treasury on this claim, therefore, is **GRANTED**.

## B.   Russell's Retaliation Claim

Russell also brings a claim for retaliation under the Rehabilitation Act. To succeed on a claim for retaliation, a plaintiff must prove that (1) she engaged in legally protected activity; (2) the defendant knew about the protected activity; (3) the defendant then took adverse employment action against the plaintiff; and (4) the protected activity and the adverse employment action are causally connected. *Gribchech v. Runyon*, 245 F.3d 547, 550 (6th Cir. 2001). The Sixth Circuit has described a plaintiff's burden at the prima facie stage as a "low hurdle." *Id.* at 550; *see also E.E.O.C. v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997) (characterizing a plaintiff's burden to establish a prima facie case of retaliation under Title VII as "minimal"). Once a plaintiff has established a prima facie case of retaliation, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for its actions. *Gribchech*, 245 F.3d at 551. Once the employer meets its burden, the plaintiff bears the burden of stating that the stated reason is pretextual. *Id.* at 552.

## 1.   Russell's Prima Facie Case of Retaliation

The parties do not dispute the first or second elements of Russell's prima facie case of retaliation. They agree that Russell engaged in protected activity when she initiated EEO proceedings, and that Meyer and Van Order knew she initiated the proceedings. Thus, to succeed on her prima facie case, Russell must demonstrate that (1) Treasury took materially

adverse employment action against her, which (2) shared a causal relationship to her EEO activity.

### a.       Russell Suffered Adverse Employment Action

The Court first considers whether Russell suffered a material adverse employment action. The burden of establishing a materially adverse employment action is less onerous in the retaliation context than in the discrimination context. *Michael v. Caterpillar Fin. Services Corp.*, 496 F.3d 584, 595-96 (6th Cir. 2007) (citing *Burlington N. & Santa Fe Ry Co. v. White*, 548 U.S. 53, 67 (2006)). As the United States Supreme Court has explained, a materially adverse employment action in the retaliation context consists of any action that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* (quotation marks omitted). The question is whether the employer's action, viewed objectively, would "deter victims of discrimination from complaining to the EEOC." *Id.* at 68. Without more, "petty slights, minor annoyances, and simple lack of good manners will not create such a deterrence." *Id.* at 68.

Russell argues that she suffered three adverse employment actions: (1) Van Order recommended her termination; (2) Meyer required her to provide medical certification to support her request for FMLA leave; and (3) Meyer or Van Order or both subjected her to severe and pervasive retaliatory harassment.

Van Order's termination proposal unquestionably constitutes an adverse employment action. It is beyond dispute than an employee would feel deterred from engaging in protected activity if in response her supervisor would recommend her dismissal. *Burlington*, 548 U.S. at 68; *see also D'Andrea v. University of Hawaii*, 686 F. Supp. 2d 1079, 1088 (D. Hi. 2010) ("Threats may rise to the level of an adverse employment action in a retaliation claim if, under

31

the particular circumstances, those threats would have deterred a reasonable employee from engaging in protected activity."); *Reece v. Pocatello/Chubbuck School Dist. No. 25*, 713 F. Supp. 2d 1222, 1230 (D. Id. 2010) ("Undeserved reprimands and threats of severe disciplinary action may constitute adverse employment actions."); *E.E.O.C. v. Collegeville/Imagineering*, 05-cv-3033, 2007 WL 2051448, at *8 (D. Az. July 16, 2007) (concluding plaintiff put forth prima facie evidence of material adverse action by showing supervisor with requisite power threatened to terminate plaintiff).

The same is not true, however, with regard to Meyer's requirement that Russell provide medical certification to support her request for FMLA leave.  First, although Russell makes the general assertion in her brief that Meyer denied her requests for leave pending resolution of the certification issue, she points to no specific instances in which this occurred.  Nor does the record indicate that Meyer denied Russell's requests for leave during this period, or, with the exception of one request, at any other time during Russell's employment.  In fact, Russell testified in deposition that the only time Meyer denied her request for leave was in August, 2005 when she requested the day off to attend her son's orientation while she was a trainee, which was well before Meyer requested the medical certification.[9]  (Russell Dep. 74:15-75:1, Def.'s Mot. Summ. J. Ex. 1, ECF No. 30-1.)

Second, the case that Russell cites to support her position regarding Meyer's request for medical certification is inapposite here.  In that Southern District of Ohio case, the Court, in denying the employer's motion to dismiss, held that the employer's refusal to allow the plaintiff to contact her severely disabled son during work hours and on her lunch break could constitute a materially adverse action.  *Frank v. Potter*, No. 1:08-cv-595, 2009 WL 2982876 (S.D. Oh. Sept.

---

[9] Meyer apparently requested the medical certification in May, 2006.

32

15, 2009).  Notably, the question in *Frank* arose in the discrimination context, not retaliation, and involved the less-onerous standard of a motion to dismiss.  More importantly, few factual similarities exists between *Frank* and this case.  There, the employer prohibited the plaintiff, and only the plaintiff, from using her cell phone during work hours and from returning home during her lunch break.  This prohibition effectively severed the plaintiff's only means of checking on her severely disabled son during the day, who completely depended on her for care.  The Court found that the "denial of access to her son" could constitute a materially adverse change in the plaintiff's terms and conditions of employment.  *Id.* at 7.  Here, Russell does not offer evidence that Meyer's request for medical certification effectively denied her access to her son.  In fact, it appears that Meyer routinely accommodated Russell's requests for leave, credit hours, and flex-place, so that she could attend to her son's needs.  (Leave E-L., Def.'s Mot. Summ. J. Exs. 10-12, ECF No. 30-10-12.)

Lastly, Meyer acted within the bounds of the FMLA when he requested that Russell provide medical certification.  *See*  29 U.S.C. § 2613(a) ("An employer may require that a request for leave . . . be supported by a certification issued by the health care provider . . .[, and t]he employee shall provide, in a timely manner, a copy of such certification to the employer.")  Russell has not presented evidence to demonstrate that such lawful employer action, without more, constitutes an adverse employment action.

The Court also disagrees with Russell's contention that she suffered severe and pervasive retaliatory harassment that rises to the level of an adverse employment action.  Russell contends that the following instances constitute harassment: Meyer denied Russell's requests for FMLA leave pending resolution of the medical certification issue; Van Order accused Russell of violating a non-existent dress code, authorized the search of Russell's locked desk, and

"essentially accused Russell of being a crazy woman with a gun"; and Peters altered Russell's time cards.  (Pl.'s Op. 33, ECF No. 37.)  For the reasons discussed in detail in the next section, none of the instances Russell cites, standing alone or combined, constitutes severe and pervasive retaliatory harassment.  Rather, they are "ordinary tribulations of the workplace."  *Burlington Northern*, 548 U.S. at 67.

Accordingly, the only materially adverse employment action Russell suffered for purposes of her retaliation claim is Van Order's termination proposal.

### b.   Treasury's Adverse Action Was Causally Related to Russell's EEO Activity

The final element Russell must establish to succeed on her prima facie case of retaliation is causation.  Specifically, she must demonstrate that a causal link exists between her EEO activity and Van Order's termination proposal.  *Hamilton v. Starcom Mediavest Group, Inc.*, 522 F.3d 623, 628 (6th Cir. 2008).  She meets her burden if she "proffer[s] evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action."  *Avery*, 104 F.3d at 861.

As evidence that the May, 2007 termination proposal is causally related to her EEO activity, Russell points to Van Order's TIGTA affidavit in which Van Order discusses the intrusion of the EEO process on the work environment.  Treasury counters that Russell mischaracterizes Van Order's affidavit.  It also argues that Van Order's discontent with the work environment notwithstanding, the TIGTA affidavit alone is insufficient to establish causation.

Viewing the evidence in the light most favorable to Russell, the Court finds that Russell has proffered sufficient evidence to carry her "minimal" burden of establishing causation at the prima facie stage.  *Id.*  Van Order characterized the work environment as "extremely uncomfortable and distractive," partially because Russell's and others' EEO activities had an

34

intrusive effect in the office. (Pl.'s Op. App. III, Ex. B, ECF No. 37-8.) This evidence is minimally sufficient to establish that a causal nexus exists between Russell's EEO activity and Van Order's termination proposal. Thus, Russell has established a prima facie case of retaliation.

## 2.      Treasury's Legitimate Nondiscriminatory Reason

Treasury now bears the burden to articulate a legitimate nondiscriminatory reason for its adverse action. *Upshaw*, 576 F.3d at 585. As is the case in a discrimination claim, an employer's burden at this stage "is merely one of production, not persuasion, and it does not involve credibility assessments." *Id.* at 589. Its burden is met if the employer "simply explains what [it] has done or produces evidence of a legitimate nondiscriminatory reason." *Sweeney*, 439 U.S. at 25 n.2 (internal quotation marks omitted).

Treasury offers Russell's performance deficiencies as its legitimate nondiscriminatory reason for the termination proposal. Treasury has met its burden.

## 3.      Russell Cannot Demonstrate That Treasury's Stated Reason is Pretextual

Russell must now demonstrate that Treasury's legitimate nondiscriminatory reason is pretext to hide unlawful retaliation. Here again, she can do so if she proves that the stated reason (1) has no basis in fact; (2) did not actually motivate the adverse action; or (3) is insufficient to motivate the adverse action. *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 349 (6th Cir. 2012) (citing *Manzer*, 29 F.3d at 1084). Russell does not indicate which of the three methods applies to her claim. She cannot rely on the third method, however, because she has not offered evidence that Treasury treated other similarly situated employees differently than her. *Kroger*, 319 F.3d at 866. Thus, she must either demonstrate that (1) Treasury's stated reason has no basis

in fact; or (2) Treasury's stated reason did not actually motivate the adverse action.  She can do neither.

As discussed above, Russell repeatedly acknowledges her performance problems throughout the record, which precludes her from showing that Treasury's stated reason has no basis in fact.  Nor can Russell show that Treasury's stated reason did not actually motivate the adverse action.  The only evidence Russell relies on to establish pretext is Van Order's TIGTA Affidavit: "Van Order's justification for her decision was pre-textual on a number of grounds, and Van Order's TIGTA Affidavit demonstrates beyond question that Russell's pursuit of her EEO action was a motivating factor in many of Van Order's actions."  (Pl.'s Op. 32, ECF No. 37.)  The Court disagrees.  In her affidavit, Van Order mentions Russell as one of many factors that contributed to a tense and negative work environment.  In all, she names three separate employees who were allegedly causing difficulty at that time.  Moreover, Van Order makes clear that the environment was difficult for the employees, not for her.  *See* Pl.'s Op. App. III, Ex. B, ECF No. 37-8 ("Managers were accustomed to such things, but employees were not . . . .").  Finally, although Van Order mentions Russell's EEO activity in her affidavit, the bulk of her references to Russell pertain to Russell's alleged hostility, aggressiveness, and obsessive attitude over her FMLA requests and performance issues.  The slight mention of Russell's EEO activity cannot overcome Russell's well-documented and acknowledged performance deficiencies.  Simply put, Russell cannot demonstrate that Treasury's stated reason for the termination proposal is pretext to hide unlawful retaliation.  Russell's retaliation claim, therefore, fails.  Summary judgment for Treasury on this claim is **GRANTED**.

**C.      Russell's Hostile Environment Claim**

Finally, Russell brings a hostile work environment claim alleging that Treasury subjected her to severe and pervasive harassment because of her son's disability.  Again, the Rehabilitation Act is the exclusive remedy for government employees bringing disability-related claims against their employer. *Peltier*, 388 F.3d at 989.  The Rehabilitation Act provides that the standards governing ADA claims will also govern claims brought under the Rehabilitation Act.  29 U.S.C. § 791(g) (2009).

As a threshold matter, it is not clear that a hostile environment claim arising from associational discrimination is cognizable under the ADA, and therefore the Rehabilitation Act. The Sixth Circuit has recognized claims for harassment based on a plaintiff's disability.  *Coulson v. The Goodyear Tire & Rubber Co.*, 31 Fed. App'x 851 (6th Cir. 2002); *Keever v. City of Middletown*, 145 F.3d 809 (6th Cir. 1998); *Trepka v. Board of Educ.*, 28 Fed. App'x 455 (6th Cir. 2002). The court of appeals, however, has yet to confront a hostile environment claim based on a plaintiff's association with a disabled person.  Other courts confronted with the issue have declined to decide either way whether such a claim is cognizable.  *See Magnus v. St. Mark United Methodist Church*, No. 10-cv-380, 2010 WL 4177614, at *5 (N.D. Ill. Oct. 19, 2010) (court assumed without deciding that a hostile environment claim based on associational discrimination was cognizable under the ADA); *Colon v. San Juan Marriott Resort & Stellaris Casino*, 600 F. Supp. 2d 295, 311 (D.P.R. May 1, 2008) (assumed without deciding the validity of a hostile environment claim based on association discrimination); *Torres-Soto v. ARB Recycling, Inc.*, No. 04-cv-1346, 2005 WL 1640872, at *8 (D.P.R. Jul. 8, 2005) (court assumed without deciding that such a claim exists).  The lone case Russell cites to support her hostile

work environment claim involved harassment based on an employee's race. *Parks v. Geithner*, No. 3:09-cv-141, 2011 WL 6148701 (S.D. Ohio Dec. 9, 2011).

Like the other courts that have addressed this issue, the Court assumes without deciding that a hostile work environment claim based on associational discrimination is cognizable under the ADA and, by analogy, the Rehabilitation Act. Even assuming that it is, Russell's hostile environment claim nevertheless fails.

**1.    Russell's Prima Facie Case for Hostile Environment**

To succeed on a hostile work environment claim, a plaintiff must prove that (1) she is disabled (or here, that she shares a relationship with a disabled person); (2) she experienced unwelcome harassment; (3) her relationship with the disabled person motivated the harassment; (4) the harassment unreasonably interfered with her work performance; and (5) the defendant either knew or should have known of the harassment yet failed to take corrective action. *Trepka*, 28 Fed. App'x at 461.[10] The question is whether the plaintiff endured a work environment "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 514 (6th Cir. 2009) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). A plaintiff must establish both an objective and subjective component. The objective component requires proof of "an environment that a reasonable person would find hostile or abusive." *Id*. The victim must also "subjectively perceive the environment to be abusive." *Id.*; *see also Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999) (noting that the employer's "conduct must be severe or pervasive enough to

_____

[10] The Sixth Circuit has noted that "[t]he standard for ADA hostile work environment claims tracks that used for hostile work environment sexual harassment claims." *Coulson*, 31 Fed App'x at 858.

create an environment that a reasonable person would find hostile or abusive, and the victim

must subjectively regard that environment as abusive") (citation and quotation marks omitted).

Here, the parties do not dispute that Russell shares a relationship with her son, who is

disabled. Russell cannot, however, establish the remaining elements of her claim.

### a. Russell was not Subject to Severe and Pervasive Harassment

Russell contends that the following instances constitute severe and pervasive harassment:

Meyer denied Russell's request for FMLA leave; Meyer denied Russell's request to work credit

hours; Van Order accused Russell of violating a non-existent dress code; Van Order accused

Russell of being disruptive in her telephone conversations; Van Order directed the search of

Russell's locked desk; and Van Order accused Russell of threatening employees with a gun.

Russell also claims that various actions by Margaret Peters, Meyer's secretary, constitute

harassment. Specifically, Peters refused to provide Russell with assistance and supplies, and she

confronted another employee who offered to assist Russell; Peters altered Russell's time cards,

which cost Russell money on one occasion; and Peters accessed Russell's confidential taxpayer

information.

None of the instances involving Meyer or Van Order, alone or together, created an

environment "permeated with discriminatory intimidation, ridicule, and insult" so severe or

pervasive to alter the terms and conditions of Russell's employment. *Barrett*, 556 F.3d at 514.

Meyer denied just one of Russell's many requests for leave during the entire nearly three-year

period in which he supervised her. (Russell Dep. 74:15-75:1, Def's Mot. Summ. J. Ex. 1, ECF

No. 30-1.) The same is true with regard to his denial of her request to work credit hours.

Although Meyer denied her request in December, 2005 when she was in training, the record

indicates that he routinely approved her requests after that. (Leave E-L., *Id.* at Exs. 10-12, ECF

39

No. 30-10-12.) Van Order's discussions with Russell over her attire, her telephone etiquette, and her coworker's expressed concern over her purchase of a firearm likewise fall short of harassment. Conversations with employees about work-related issues do not constitute harassment simply because they cause the employee distress. *Keever*, 145 F.3d at 813. This proposition is especially true with regard to the firearm incident. Not only does the Court find no basis for Russell's characterization of the situation,[11] but it notes that employers have an obligation to address their employees' safety concerns. Finally, Van Order's search of Russell's desk, although a closer question, does not qualify as intimidation, ridicule, or insult sufficient to create a hostile work environment. One instance of questionable conduct over the course of nearly three years is not so "severe or pervasive" to change Russell's terms and conditions of employment. *See Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 788 (6th Cir. 2000) ("Simple teasing, offhand comments, and *isolated incidents* . . . will not amount to discriminatory changes in the 'terms or conditions' of employment.") (emphasis added) (quoting *Fragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998)).

Nor can Peters' actions serve as the basis of a hostile environment claim. Peters was Russell's coworker. Where a coworker engages in harassment, the plaintiff must prove that the employer "knew or should have known of the harassment, yet failed to take prompt and appropriate corrective action." *EEOC v. Harbert-Yeargin, Inc.*, 266 F.3d 498, 518 (6th Cir. 2001). Even if the Court assumes that Peters' conduct was sufficiently severe or pervasive to constitute harassment, Russell has not offered evidence that Meyer or Van Order knew about the

---

[11] Russell characterizes the incident as Van Order "accus[ing her] of threatening employees with a gun." (Pl.'s Op. 34, ECF No. 37.) The record reveals that Russell's supervisor and a union representative discussed the issue with Russell and placed a non-disciplinary, non-accusatory memorandum in Russell's file memorializing the conversation.

conduct, yet failed to take corrective action.[12]  In fact, in an e-mail message Meyer acknowledges that Peters had made mistakenly altered Russell's time card, and indicated that he planned to require Peters to obtain his approval before making any alterations in the future.  Furthermore, Peters ultimately faced disciplinary proceedings, not only for the unauthorized access of Russell's taxpayer information, but for "[d]iscourteous or [u]nprofessional behavior . . . [and m]aking remarks or gestures that a reasonable person would consider rude, abusive, or discourteous."  (Pl.'s Op. App. III, Ex. C, ECF No. 37-8.)  Treasury ultimately suspended Peters for two weeks without pay for accessing Russell's confidential files.  *Id.*

Accordingly, Treasury has demonstrated that no genuine issue of material fact exists as to whether Russell suffered severe and pervasive harassment that effectively altered the terms and conditions of her employment.  Her hostile environment claim thus fails.

### b.     Russell Cannot Establish the Remaining Elements of a Hostile Environment Claim

Although her failure to establish severe and pervasive harassment is fatal to her claim, for the sake of completeness the Court also notes that Russell cannot establish the remaining elements of a hostile environment claim.

In an attempt to demonstrate a causal link between the alleged harassment and her association with her disabled son, Russell argues that such a link "cannot be doubted, based on Van Order's TIGTA affidavit and her implicit threat . . . to make life difficult for [me] if [I] did[ not] quit or back off."  *Id.* at 34.  The Court disagrees.  Van Order makes no mention of Russell's son or his disability in her affidavit.  She also does not express hostility toward Russell's need

---

[12] Russell contends in her brief that she "complained frequently about [Peters'] actions, and neither Meyer or Van Order did anything to stop them."  (Pl.'s Op. 35, ECF No. 37.) However, she cites no evidence from the record to support her assertion.

for time off to care for him.  Likewise, Van Order's April, 2006 comments do not establish a genuine issue of material fact as to causation.  Van Order made these two ambiguous comments well over a year before any of the incidents allegedly constituting harassment took place.

Finally, Russell has not addressed the final requirements of a prima facie case of hostile environment.  She does not offer evidence that the alleged harassment unreasonably interfered with her work performance.  Nor does she offer evidence to establish the subjective component of her claim.  Accordingly, Russell has not succeeded on her prima facie case for hostile environment. Summary judgment for Treasury on this claim is, therefore, **GRANTED**.

## IV.  CONCLUSION

No genuine issue of material fact exists with regard to Russell's claims of associational discrimination, retaliation, or hostile work environment.  Treasury's Motion for Summary Judgment is **GRANTED** as to all three of Russell's claims.  (ECF No. 30.)  The Clerk is **DIRECTED** to enter judgment in favor of Defendant and remove this case from the Court's pending case list.

**IT IS SO ORDERED.**

Date: November 13, 2012                              */s/ Elizabeth A. Preston Deavers*
                                                    Elizabeth A. Preston Deavers
                                                    United States Magistrate Judge

42